**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DELORA COLES,** | ) | |
| 8540 W. 131st Terrace, Apt. 1623, | ) | |
| Overland Park, KS 66213, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| **CITY OF OVERLAND PARK,** | ) | |
| **KANSAS,** | ) | **JURY TRIAL DEMANDED** |
| (Serve: | ) | |
| Elizabeth Kelley | ) | |
| City Clerk of Overland Park, Kansas | ) | |
| 8500 Santa Fe Dr. | ) | |
| Overland Park, KS 66212), | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

Plaintiff Delora Coles states the following as her cause of action against Defendant City of Overland Park, Kansas.

1.    Plaintiff Delora Coles (Plaintiff) is a female resident of Overland Park, Johnson County, Kansas.

2.    Defendant City of Overland Park, Kansas (Defendant) is a municipality operating under the laws of the State of Kansas.

3.    The Overland Park, Kansas Police Department is a division, department, and/or agency under the supervision of Defendant.

4.    Defendant is an employer as defined and within the meaning of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq.

5.      Plaintiff is bringing this claim pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq. and/or 42 U.S.C. § 12203(a).

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

7.      Venue is proper because Defendant resides in Johnson County, Kansas in the District of Kansas and/or because a substantial part of the events or omissions giving rise to these claims occurred in Johnson County, Kansas in the District of Kansas within the meaning of 28 U.S.C. § 1391(b).

8.      Plaintiff filed timely Charges of Discrimination with the Equal Employment Opportunity Commission alleging that Defendant engaged in the discriminatory actions that are being raised in this lawsuit, or alternatively, the allegations of Plaintiff's lawsuit would have arisen from the investigation of Plaintiff's Charges of Discrimination.

9.      A Notice of Right to Sue has been issued by the Equal Employment Opportunity Commission and this action is being brought within ninety (90) days from the issuance of such Notice of Right to Sue.

10.      Plaintiff has fulfilled all conditions precedent to the bringing of this claim and has duly exhausted all administrative procedures in accordance with the law prior to instituting this lawsuit.

11.      Plaintiff first began working for Defendant on January 7, 2019, as a Police Officer in the Overland Park Police Department (OPPD).

12.      OPPD is divided into North and South Patrol.

13.      At the time of Plaintiff's termination, she was assigned to work in North Patrol.

14.     In September 2022, Plaintiff filed a sexual harassment complaint with Defendant against her supervisor, Sergeant George Naylor ("Sgt. Naylor").

15.     Defendant hired Michelle Minor (Minor), an outside investigator, to investigate Plaintiff's complaint.

16.     During the investigation, Defendant did not keep Plaintiff informed on its progress of her case, did not provide her with status updates, and did not warn her when Sgt. Naylor was going to be at the station so Plaintiff could avoid any interactions with him.

17.     During the investigation, information about Plaintiff's complaint leaked to other individuals in her department, and Plaintiff's co-workers and command staff began to alienate themselves from her.

18.     Those individuals who were previously friendly or cordial began to ignore Plaintiff.

19.     Plaintiff notified Sergeant Stephanie Moore with OPPD's Professional Standards Unit ("PSU") that she had concerns about retaliation because information about her sexual harassment complaint had leaked, and Plaintiff was hearing rumors going around the department.

20.     OPPD terminated Sgt. Naylor in late October 2022.

21.     After his termination, Sgt. Naylor told other individuals at OPPD that he was fired because of Plaintiff.

22.     Sgt. Naylor's friends at OPPD tried to discuss his termination with Plaintiff on multiple occasions.

23.     From the date of Sgt. Naylor's termination in late October 2022 through the date of Plaintiff's termination on June 15, 2023, the chain of command for North Patrol was as follows: Sergeant Scott Ferguson ("Sgt. Ferguson") was Plaintiff's immediate supervisor, Captain Tirsa

Otero ("Cpt. Otero") was the Captain above Sgt. Ferguson, and Major Ryan Miller ("Maj. Miller") was in charge of North Patrol.

24.     Cpt. Otero was friends with Sgt. Naylor.

25.     Cpt. Otero used to speak to Plaintiff regularly at the station, but after Sgt. Naylor was terminated, Cpt. Otero began treating Plaintiff differently than she had previously, including ignoring Plaintiff in the halls while still greeting others.

26.     Likewise, Sgt. Ferguson began to treat Plaintiff differently after Sgt. Naylor's termination.

27.     Both Cpt. Otero and Sgt. Ferguson began to discipline Plaintiff for insignificant incidents for which other officers were not disciplined.

28.     Plaintiff believes Cpt. Otero and Sgt. Ferguson were watching her carefully and documenting every minor error she made in order to find a way to terminate her employment in retaliation for her having filed a sexual harassment complaint against a fellow officer.

29.     On approximately September 30, 2022, after Plaintiff filed the sexual harassment complaint against Sgt. Naylor, Plaintiff had a meeting with Chief of Police Francis "Frank" Donchez (Chief Donchez).

30.     It was Plaintiff's understanding that Chief Donchez has an open-door policy and off-duty officers can walk in as needed.

31.     Plaintiff wore a nice blouse and jeans to the meeting because she was off duty and not in uniform.

32.     A few days after the meeting, Sgt. Ferguson told Plaintiff that she should not have worn jeans to the meeting.

4

33.     At that time, Sgt. Ferguson did not say anything about adding coaching to Plaintiff's file regarding how she dressed for the meeting with Chief Donchez.

34.     Individuals on Plaintiff's team and on other teams noticed the different, less favorable way that Cpt. Otero began treating Plaintiff and questioned what Plaintiff did to make Cpt. Otero come after her.

35.     On November 22, 2022, Plaintiff was in the locker room, and she realized that she did not have her uniform pants.

36.     Plaintiff called Sgt. Ferguson approximately ten minutes before her shift began to notify him that she needed to go home to get her uniform pants.

37.     Sgt. Ferguson told Plaintiff to be as quick as possible, but he did not say anything about using leave or that she would be written up for this incident.

38.     Plaintiff rushed home to get her pants and returned to work seven minutes late for her shift.

39.     Maj. Miller issued Plaintiff a verbal reprimand because she did not request 15 minutes of leave. (OPPD measures time in quarter-hour increments.)

40.     No one had ever told Plaintiff she needed to request leave for situations such as this one.

41.     Additionally, it is Plaintiff's understanding that when the same or similar situation has happened to other officers, the commanding officer has either told the officer to apply for leave and/or just requested leave for the officer without any reprisal to the officer.

42.     On November 29, 2022, Plaintiff received a verbal reprimand from Sgt. Ferguson for arriving at work one hour late.

43.     Plaintiff's cell phone had caught fire the day before, and she rushed out to buy a new one.

44.     Plaintiff had never used the alarm on the new phone and was not aware that she had to "allow" a notification to go to her alarm clock.

45.     Because Plaintiff had not changed the setting, her alarm clock did not go off, and she woke up late that morning.

46.     Plaintiff explained what had happened to Sgt. Ferguson, but she could tell from his facial expression that he did not believe her.

47.     In December 2022, Plaintiff requested approval from Cpt. Otero to attend multiple online training sessions, including trainings related to domestic violence and child crimes.

48.     Many of the trainings Plaintiff requested to attend were offered free of charge and could be taken by Plaintiff at a time convenient for her.

49.     Cpt. Otero told Plaintiff she sent her training requests up the chain of command for approval.

50.     Plaintiff followed up with Cpt. Otero on several occasions to ask about approval of the training, and Cpt. Otero told Plaintiff her requests for training had not yet been approved.

51.     OPPD usually approved free training requests without issue.

52.     It is very important to Plaintiff to keep up with her training because she is passionate about helping victims of domestic violence.

53.     In fact, because of her extensive training in this area, OPPD regularly assigned Plaintiff to domestic violence calls/situations.

54.     In approximately December 2022, Sgt. Ferguson began calling Plaintiff into his office for meetings almost every week to discuss incidents that had not been issues before her sexual harassment complaint.

55.     Sergeants are only required to review two or three body camera videos per month for each of their officers, but Plaintiff believes Sgt. Ferguson was watching more than two or three of her videos per month because he was constantly finding minor reasons to critique her.

56.     Plaintiff believes that Cpt. Otero instructed Sgt. Ferguson to call her five or six times per day, sometimes more, to ask where she was, what she was doing, what reports she needed to finish, and to harshly critique her reports.

57.     Cpt. Otero was also in charge of Sgt. Ferguson and Sergeant Mike McNeely (Sgt. McNeely) teams.

58.     Sgt. Ferguson often said that Cpt. Otero told him she wanted to know what was going on with the team, but officers on Sgt. McNeely's team told Plaintiff that Sgt. McNeely did not call to check up on them very often.

59.     Plaintiff worked with the Police Explorers Program, a group of high school and community college students (or cadets) who participate in drills, camps, ride-a-longs, and informative sessions with police officers.

60.     Once, a cadet from the Police Explorers Program was riding with Plaintiff on patrol, and she said it was strange how often Sgt. Ferguson was calling Plaintiff and it seemed like he was intentionally targeting her.

61.     On December 17, 2022, Sgt. Ferguson gave Plaintiff the overall rating of "Performer" on her performance review, including a rating of "Contributor" for Teamwork.

7

62.     The possible ratings on Plaintiff's performance review were "Under Performer," "Performer," "Contributor," and "Key Contributor."

63.     Plaintiff's appraisal included numerous positive reviews and compliments from other officers and OPPD staff concerning her work with domestic violence victims and her willingness to provide assistance to other officers.

64.     Despite these positive reviews from others within the Department, Plaintiff believes Sgt. Ferguson gave her a lower rating of "Performer" in retaliation for reporting sexual harassment.

65.     On January 19, 2023, Cpt. Otero stood in the doorway during roll call watching Plaintiff.

66.     Cpt. Otero watching her made Plaintiff feel uncomfortable because she did not understand why Cpt. Otero was looking at her.

67.     On January 21, 2023, Sgt. Ferguson told Plaintiff that Cpt. Otero checked the keycard scanner after she arrived at work at 6:00 a.m. and found out that she was 15 seconds late to roll call.

68.     Cpt. Otero also called Plaintiff to discuss her tardiness.

69.     Cpt. Otero cut Plaintiff off before she could explain why she was late, and she abruptly hung up without saying goodbye or giving Plaintiff any indication that the call was ending.

70.     In or about late January 2023, Plaintiff reported Cpt. Otero's negative treatment toward her to Maj. Miller.

71.     Plaintiff told him that she thought Cpt. Otero was out to get her and stated that she did not treat her this way before everything.

8

72.    By "everything," Plaintiff meant her sexual harassment complaint against Sgt. Naylor.

73.    Plaintiff believes Maj. Miller knew what she meant.

74.    Maj. Miller shrugged and said this was not a valid complaint, it was all in her head, and Plaintiff should take responsibility for her actions.

75.    In January 2023, Plaintiff reported to Sgt. Ferguson that she felt targeted by him and Cpt. Otero and it was causing her mental health to suffer.

76.    Sometimes it was hard for Plaintiff to enter the building, especially if Cpt. Otero was working.

77.    Plaintiff also shared with Sgt. Ferguson her belief that Cpt. Otero was rude over the telephone when she called Cpt. Otero about arriving 15 seconds late.

78.    Sgt. Ferguson ignored Plaintiff's request for support and later told Cpt. Otero that Plaintiff thought she was rude.

79.    On January 31, 2023, Plaintiff had a meeting with Cpt. Otero and Sgt. Ferguson.

80.     Cpt. Otero said she was not coming after Plaintiff because she was not important enough to take up that much of her time.

81.    Cpt. Otero then stated that she had checked a month of parking lot videos of Plaintiff arriving at work, which Plaintiff believes indicated that she had in fact been monitoring her.

82.    Cpt. Otero also accused Plaintiff of being unprofessional and having a bad attitude because Plaintiff did not always add a subject line to her emails, and she claimed that Plaintiff was not working hard enough and needed to make even more traffic stops.

83.     While it is true that Plaintiff did sometimes forget to include a subject line when responding quickly to a Sergeant's question via email, she had never before been told that her failure to include a subject line was a concern.

84.     Also, although officers are regularly told to make more traffic stops, this is the first time Plaintiff had been told that she was not working hard enough and the first time she had ever received negative feedback for not making enough traffic stops.

85.     Plaintiff was usually too busy with calls to make very many traffic stops.

86.     The department has officers who specifically handle traffic stops and accidents, and these officers issue more citations than patrol officers.

87.     OPPD was so short staffed that they often pulled in traffic and TAC/SWAT officers to help respond to calls.

88.     Cpt. Otero did not give Plaintiff many opportunities to talk during the meeting, but Plaintiff did manage to tell her that she would make sure to include a subject line in her emails in the future.

89.     At the end of this meeting, and only after Plaintiff believes Cpt. Otero became aware of her reports of retaliation, Cpt. Otero told Plaintiff that she was going to approve Sexual Assault Response Team (SART) training for her.

90.     SART training was not one of the training classes Plaintiff previously requested in December 2022.

91.     On February 19, 2023, Plaintiff requested vacation for her niece's graduation in June 2023.

92.     Cpt. Otero said she could not approve her request because there were not enough hours in her bank at the time Plaintiff made her request.

93.     However, Plaintiff would have accumulated enough hours by the date of her vacation in June.

94.     Prior to her sexual harassment complaint, Cpt. Otero approved Plaintiff's vacation requests when she did not have enough hours banked at the time of her request.

95.     Plaintiff believes other officers also had their requests for leave approved prior to them having accumulated enough hours for leave at the time of their request.

96.     In early 2023, Sgt. Ferguson called Plaintiff to his office and asked her why she was putting three hours of overtime on her time sheets every other Thursdays.

97.     Plaintiff explained that she worked with the Police Explorers Program on every other Thursday.

98.     Sgt. Ferguson told Plaintiff she only gets paid for the time she was actually there, and Plaintiff told him that she was aware of that, but she was there from 5:30 to 8:30 p.m.

99.     Plaintiff has been working with the Police Explorers Program since 2021 and nobody at OPPD had ever questioned her overtime until after she reported Sgt. Naylor for sexual harassment.

100.     In approximately late February/early March, after reviewing her body camera video, Sgt. Ferguson admonished Plaintiff because she *asked* a man who admitted to committing domestic violence if she could go inside with him to get his shoes before taking him to jail instead of *telling* him that she would go inside with him.

101.    Sgt. Ferguson told Plaintiff that she should never ask and needed to speak to people with more authority.

102.    Plaintiff had never before been told that she needed to act with more authority.

103.    Plaintiff asked questions on how to speak to show respect to others while still holding authority.

104.    If the man had said no to her request, Plaintiff would have told him that she was going inside with him.

105.    In February or March 2023, Sgt. Ferguson issued coaching/counseling to Plaintiff for allegedly being unprofessional and/or rude to a juvenile who refused to leave a house after being kicked out by the homeowner.

106.    This was the second time officers had been called to the scene, and the juvenile was making multiple excuses to avoid leaving and screaming insults about the police, including saying that "cops are dumb and ignorant," while a dog was barking.

107.    Because of the screaming and barking, it sometimes made it difficult for Plaintiff to hear what the juvenile was saying, and she had to interrupt him a few times.

108.    The juvenile reported Plaintiff for interrupting him and for using the word "damn" when she commented that she could not hear him because his "damn dog" was barking in her ear.

109.    On teams that Plaintiff was on previously, other officers engaged in verbal altercations and even physical fights with people without cause and were not disciplined for it.

110.    On March 10, 2023, Plaintiff could not make it to a shift at the convention center because of an issue with her son, and she notified the officer in charge and another assigned officer via email.

111.    A few days later, Sgt. Ferguson and Maj. Miller wrote Plaintiff up for emailing instead of calling, saying that she broke policy, but Plaintiff was not aware of a policy requiring her to call instead of email.

112.    Further, Plaintiff is aware of officers who did not show up for their shifts at the convention center after sending notification via a text message and/or email to the officer in charge instead of calling, and she does not believe they received any discipline.

113.    The week of March 20, 2023, Plaintiff went to the emergency room because she could not keep food down for several days due to the stress at work.

114.    The doctor said Plaintiff had a possible hiatal hernia or gastritis.

115.    Plaintiff requested time off of work to heal, but Sgt. Ferguson denied her request.

116.    Plaintiff told Sgt. Ferguson that her symptoms were related to the treatment that she was receiving at work, and that she believed the denial was reprisal for reporting sexual harassment.

117.    Sgt. Ferguson claimed he did not know what Plaintiff was talking about and ignored her mention of sexual harassment.

118.    Sgt. Ferguson instead claimed that her "stomach issues" were not enough to take time off due to staffing.

119.    Plaintiff pressed the matter due to the seriousness of Plaintiff's health issue.

120.    Another Sergeant walked into the office, and Sgt. Ferguson asked, "Do you know the process for taking time off for illness? She [indicating Plaintiff] has some stomach issues."

121.    Sgt. Ferguson's tone sounded condescending when he mentioned Plaintiff's health condition.

13

122.   Sgt. Ferguson determined that Plaintiff would have to take unpaid time off work in order to heal for her work stress induced health issue.

123.   As a single parent, Plaintiff could not afford to take unpaid leave to address her health issues so she felt she had no choice but to continue to work.

124.   On April 3, 2023, Sgt. Ferguson and Maj. Miller issued a letter informing Plaintiff that she was being placed on a one-day suspension for arriving seven minutes late because she forgot her uniform pants on November 22, 2022, arriving at work an hour late on November 29, 2022, arriving 15 seconds late on January 19, 2023, and for emailing instead of calling about her convention center shift on March 10, 2023.

125.   On April 6, 2023, Chief Donchez confirmed that Plaintiff was suspended for a day.

126.   Plaintiff chose April 27, 2023, for her suspension day.

127.   On April 8, 2023, a woman reported that a man and woman were arguing and the man pulled the woman by the arm to their car.

128.   Plaintiff located the vehicle and observed the couple in the car.

129.   The couple seemed to be speaking to each other normally, and the woman's body language was calm.

130.   Due to her experience with domestic violence cases, Plaintiff did not believe that she had probable cause to stop the car.

131.   Plaintiff was also not in the position to safely turn around and make the stop.

132.   However, after Plaintiff called her sighting in on the radio, Sgt. McNeely commanded another officer at the scene (Officer Jay Roush) and Plaintiff to make the stop, so she turned the police car she was driving around to follow the vehicle.

14

133.    During the process, Plaintiff saw that Officer Roush was nearby and had his emergency lights on.

134.    Plaintiff believed that Officer Roush was already in pursuit of the vehicle and followed him with her lights on, but Plaintiff later realized that he had not seen the vehicle, and they had lost the vehicle with the couple on I-435.

135.    Sgt. Ferguson instructed Plaintiff to write a memo about the incident and return to his office, but when she went to his office, he said he did not need her and never told her to return to his office.

136.    Plaintiff ran the tags on the reported vehicle and found that the couple lived in Springfield, Missouri so she followed up by calling the Springfield Police Department and asked them to do a welfare check on the couple.

137.    Plaintiff explained what had happened, and Springfield Police Department checked the house and reported that they had no reason to suspect a domestic violence situation.

138.    Plaintiff also interviewed the woman who made the report, and after hearing the full story, she did not believe OPPD had probable cause to make the stop.

139.    On April 15, 2023, Sgt. Ferguson called Plaintiff to his office to discuss the call on April 8, 2023.

140.    Sgt. Ferguson questioned Plaintiff about not making the traffic stop immediately, not turning her emergency lights on as she was increasing her speed to pursue the vehicle, and not slowing down before turning off her emergency lights.

141.    All of the officers in her department slow down after turning off their emergency lights, and the department very rarely disciplines employees for it.

142.    During the meeting, Plaintiff asked Sgt. Ferguson why this domestic violence report was treated more seriously than other, more dangerous domestic violence incidents, and she gave him an example of a November 2022 domestic violence call wherein no action was taken (over her objection), despite there being more evidence of a domestic violence situation.

143.    In about mid-April, Sgt. Ferguson notified Plaintiff that Cpt. Otero had decided to end her participation with the Police Explorers Program and to stop her ride-a-longs with Explorers.

144.    Sgt. Ferguson said OPPD was doing this because of Plaintiff's attitude and because of her tardiness.

145.    The cadets from the program missed Plaintiff, found her Instagram account and messaged her to ask where she was, but Plaintiff was not allowed to tell them why she could not be there.

146.    On April 20, 2023, Sgt. Ferguson told Plaintiff that Sergeant Jason Goddard had emailed him about a call she was on regarding the theft of a drink and a hat by a homeless man.

147.    The man had a very small amount of THC on his person.

148.    Plaintiff did not believe it was necessary to add the THC charge because he was already going to be unable to pay his fines for the theft charges.

149.    Sgt. Ferguson told Plaintiff she should have charged him with THC possession to motivate him to leave Overland Park.

150.    On April 27, 2023, Plaintiff told the Chief of Human Resources about her commanding officers' behavior.

16

151.    Plaintiff spoke to the Chief of Human Resources again the next day on April 28, 2023, and reported she believed OPPD was retaliating against her for her sexual harassment complaint against Sgt. Naylor.

152.    Plaintiff told the Chief of Human Resources she felt things were getting worse and that Maj. Miller and Cpt. Otero were planning to find more insignificant offenses to use against her.

153.    Human Resources again assigned Michelle Minor to investigate Plaintiff's report of retaliation.

154.    On May 2, 2023, Plaintiff was told to come to Chief Donchez's office on May 3, 2023.

155.    Plaintiff did not know what the meeting was about because she was not given any indication that the April 8, 2023, call was this serious or that the investigation had gone so far.

156.    Sgt. Ferguson had interviewed Plaintiff, and it was her understanding that Sergeants do not perform investigations for terminable offenses.

157.    During the meeting on May 3, 2023, Maj. Miller and Deputy Chief of Police Simon Happer (Dep. Chief Happer) told Plaintiff Chief Donchez was too busy to meet with her that morning.

158.    Maj. Miller and Dep. Chief Happer said Plaintiff was suspended for the April 8, 2023, call for insubordination because she did not make an immediate traffic stop and because she did not use her emergency lights properly.

159.    Dep. Chief Happer informed Plaintiff that her suspension would continue until she could meet with Chief Donchez on May 11, 2023.

160.    Maj. Miller said that he had recommended Plaintiff's termination and said that several people agreed.

161.    Maj. Miller also issued a letter to Plaintiff on May 5, 2023, listing her alleged policy violations and restating that he recommended termination.

162.    On May 5, 2023, Plaintiff met with Minor about her report of retaliation and shared information with her about the retaliation she had been experiencing.

163.    On May 11, 2023, Chief Donchez said that he would let Plaintiff know when he made his decision.

164.    Human Resources told Plaintiff she would remain on leave until the investigation was completed.

165.    On May 21, 2023, Plaintiff signed a Charge of Discrimination with the Kansas Human Rights Commission ("KHRC") and Equal Employment Opportunity Commission ("EEOC") for sexual harassment and retaliation, and shortly thereafter Plaintiff let Tammy Owens ("Owens"), the City Attorney at the time, know that the KHRC was planning on issuing a subpoena for records to the OPPD, and Plaintiff asked whether the KHRC's investigation would need to be completed before she could come back to work.

166.    The KHRC and EEOC filed Plaintiff's Charge of Discrimination on May 26, 2023.

167.    On June 12, 2023, Plaintiff met with Minor to discuss the results of her investigation.

168.    Minor admitted that she had not done a case comparison between the November 2022 and April 2023 calls, yet she concluded that there was no retaliation.

18

169.     Plaintiff also discovered for the first time that coaching had been added to her employment file for wearing jeans to her September 30, 2022, meeting with Chief Donchez.

170.     During their meeting, Plaintiff also questioned Minor about what would happen with respect to her KHRC complaint.

171.     After her meeting with Minor on June 12, 2023, Plaintiff emailed Owens and again mentioned the KHRC investigation.

172.     The next day, on June 13, 2023, Owens replied that Plaintiff would remain on administrative leave until she heard from someone with OPPD.

173.     On June 15, 2023, Plaintiff met with Chief Donchez, Maj. Miller, and Dep. Chief Happer.

174.     Chief Donchez said that Plaintiff's investigation was complete, he had reviewed the case and looked back at the video tape, and he was affirming Major Miller's recommendation of termination and that her employment with OPPD was terminated effective immediately.

175.     Plaintiff asked if she could resign instead, and he said he would accept her resignation and that there were no hard feelings.

176.     He instructed Plaintiff to type her resignation letter on a nearby computer, and she submitted it that day.

177.     On June 28, 2023, the Kansas Commission on Peace Officers' Standards and Training ("KSCPOST") sent a letter informing Plaintiff that the agency had received a Notice of Termination or Status Change from OPPD, and KSCPOST would review her separation to determine if a violation of the Kansas Law Enforcement Training Act occurred.

178.   On about July 3, 2023, Plaintiff spoke to George Brown ("Brown") at KSCPOST who advised her that OPPD had listed her resignation as "resignation under questionable circumstances" and that KSCPOST cannot review her case until OPPD completes its investigation.

179.   The information Brown shared is inconsistent with Chief Donchez and Minor telling her that the OPPD investigation into her report of retaliation was complete.

180.   Plaintiff believes this investigation has impeded her ability to find a new job as a Police Officer because another police department cannot hire her while KSCPOST is running the investigation.

152.   Plaintiff engaged in protected activity, including making complaints of and/or raising issues of sexual harassment to Defendant.

153.   As a result of Plaintiff reporting her good faith and/or reasonable belief to Defendant's management and/or human resources employees that she was being harassed/discriminated against at work and/or experiencing a harassing/hostile work environment, Defendant retaliated against Plaintiff and caused her to suffer adverse employment actions, including, but not limited to, disciplining Plaintiff, removing Plaintiff from the Police Explorers Program, denying and/or delaying Plaintiff's requests for training, denying Plaintiff's request for time off, suspending Plaintiff, and/or terminating her employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 *et seq*.

154.   As a direct and proximate result of the unlawful conduct of Defendant as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of

enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

155.    The conduct of Defendant was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

156.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendant for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all Counts and all allegations contained herein.

## REQUEST FOR PLACE OF TRIAL

Plaintiff hereby requests that the trial of this matter take place in Kansas City, Kansas.

Respectfully submitted,

**EMPLOYEE & LABOR LAW GROUP
OF KANSAS CITY, LLC**

By:   /s/Kristi L. Kingston
           Kristi L. Kingston, KS Bar No. 19126
           12920 Metcalf Avenue, Suite 180
           Overland Park, KS 66213
           Ph:    (913) 286-5200
           Fax:   (913) 286-5201
           Email: kristi@elgkc.com

**ATTORNEY FOR PLAINTIFF**