## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **DELORES COLES,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:24-cv-02296-HLT** |
| **CITY OF OVERLAND PARK, KANSAS,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

This employment discrimination case contains only one claim: retaliation in violation of Title VII. But the allegations are many. Plaintiff Delores Coles worked as a patrol officer for the Overland Park, Kansas Police Department for roughly four-and-a-half years. She reported her sergeant for sexual harassment in September 2022, and he was fired. Plaintiff contends that her chain of command began treating her differently because of her sexual-harassment complaint. She ultimately was allowed to resign in lieu of termination in July 2023.

Plaintiff contends that beginning in the fall of 2022, her new sergeant and captain became critical of her actions, unfairly disciplined and micromanaged her, denied her requests for training, and removed her from the department's voluntary Explorer Program. But there is one event that is largely the focus of this case: a report of a domestic battery and suspected kidnapping on April 8, 2023. Plaintiff was dispatched to respond. The way she responded was questioned, investigated, and eventually led to the decision to terminate her employment. Plaintiff maintains that she responded to the dispatch appropriately and that the decision to terminate her, along with the other treatment noted, was retaliatory.

Defendant moves for summary judgment. Doc. 61. The Court grants Defendant's motion because no reasonable jury could find that Plaintiff's protected activities (which are more limited than Plaintiff asserts) caused Defendant to take materially adverse employment actions against her (which are also more limited than she asserts). And, in any event, Plaintiff has no evidence suggesting that Defendant's legitimate reasons for terminating her employment and taking other actions were a mere pretext to cover unlawful retaliation. The uncontroverted facts leave nothing for a jury to resolve.

I.    **BACKGROUND**[1]

A.    **The Actors**

- <u>Plaintiff</u> is a former patrol officer in the Overland Park, Kansas Police Department. She worked for the department from 2019 through her resignation on June 15, 2023. Plaintiff also worked as a trainer in the department's Explorer Program, which is a "mini teen version of the police academy." Doc. 74-2 at 3. Her work with the Explorer Program was above and beyond her normal duties. She received overtime pay for her work with the program.

- <u>Former Sergeant George "Ray" Naylor</u> was Plaintiff's direct superior from 2020 into 2022. Plaintiff and Naylor were in a sexual relationship, which violated city policy governing nonfraternization. Plaintiff reported Naylor to Sergeant Roger Pesek for sexual harassment on September 6, 2022. The department terminated Naylor's employment on November 9, 2022, after an investigation of Plaintiff's complaint. Rumors circulated in the department about the reason for Naylor's termination.

- <u>Sergeant Scott Ferguson</u> became Plaintiff's sergeant in 2022. Plaintiff claims that Ferguson became critical of Plaintiff's actions after she reported Naylor. Ferguson constantly checked on her, as many as six times in a shift. He did not do the same with other officers. He also began calling her into his office for meetings almost every week.

- <u>Captain Tirsa Otero</u> was directly above Ferguson in Plaintiff's chain of command. She became less friendly after Plaintiff reported Naylor's harassment. She denied Plaintiff's requests for training, but she eventually approved one request but it was not one Plaintiff had requested. Otero directed Ferguson to discuss Plaintiff's overtime for the Explorer

---

[1]    For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to the nonmoving party.

Program. Otero decided in 2023 that Plaintiff would no longer be allowed to have a student ride along with her through the Explorer Program because she had received disciplinary actions and was under investigation for dereliction of duty. Plaintiff regards Otero's action as "removing" her from the program. But Plaintiff was still allowed to attend Explorer Program meetings.

- Major Ryan Miller was directly above Otero in Plaintiff's chain of command. Ultimately, Miller recommended Plaintiff's termination. Miller told Ferguson to investigate a citizen's complaint about Plaintiff on January 10, 2023. He told Ferguson that he wanted Plaintiff's professionalism addressed and that Plaintiff needed to increase her maturity and professionalism. He suggested that maybe Plaintiff should be disciplined in addition to Naylor for her own actions. Plaintiff told Miller in January 2023 that Otero was "picking on her." But Miller did not escalate the report because he did not hear Plaintiff use the term "retaliate."

- Captain Todd Chappell was the watch commander on April 8, 2023. There was a physical disturbance that day and a witness reported a domestic battery and possible kidnapping. Plaintiff was dispatched to respond, and Chappell watched traffic videos live that showed her response. He was highly displeased with her actions. He emailed Miller a description of what he observed and heard and requested formal discipline of Plaintiff.

- Sergeant McNeely was the acting sergeant during the April 8 physical disturbance. He directed Plaintiff over the police radio to stop the vehicle and investigate.

- Officer Jay Roush responded with Plaintiff to the April 8 physical disturbance call.

- Deputy Chief Simon Happer was above Miller in Plaintiff's chain of command. Happer told Miller to have Ferguson handle the citizen's complaint about Plaintiff. Happer considered whether Plaintiff also should have been disciplined for conduct unbecoming and for poor decision-making and judgment regarding Naylor.

- Chief Francis "Frank" Donchez decided to terminate Plaintiff based on the results of Ferguson's investigation into how Plaintiff handled the April 8 event. He also decided to terminate Naylor in November 2022.

### B.    Overview of Relevant Events

Defendant presented 86 purportedly uncontroverted facts in support of its summary-judgment motion. Plaintiff attempted to controvert many of those and submitted an additional 169 facts of her own. The Court has scrupulously reviewed the record and the parties' disputes. What follows is a summary of the material uncontroverted facts drawing reasonable inferences in

Plaintiff's favor. Many facts submitted are simply not material to the sole issue before the Court: whether a reasonable jury could find that Defendant retaliated against Plaintiff for her complaints of discrimination.[2] All dates below are during the last third of 2022 and the first half of 2023, presented (roughly) chronologically.

- <u>September 6 (Complaint about Naylor)</u>: Plaintiff reported to Pesek that Naylor had sexually harassed her. Pesek contacted Miller about the discussion with Plaintiff and drafted a memorandum to Happer, advising him of the report.

- <u>September 30 (Retaliation Complaint Related to Naylor)</u>: Plaintiff reported to Sergeant Stephanie Moore in the department's Professional Standards Unit that officers who "used to be on Naylor's team" were "talking about what happened" and saying they heard Plaintiff had been sexually harassed or assaulted. The City Attorney investigated Plaintiff's new allegations as a supplement to her original complaint and found on December 8 that Naylor had breached the City's anti-retaliation policy. But the City had already terminated Naylor's employment by that time, so no further discipline was imposed.

- <u>Around October 19 (Miller's Receipt of Naylor Report)</u>: Happer provided Miller with a copy of the report about Naylor's sexual harassment. Happer gave Miller the report so that he could review, consider, and propose corrective action. Miller decided Naylor should be terminated for policy violation.

- <u>In September or October (Ferguson's Knowledge of Naylor's Termination)</u>: Ferguson knew that Naylor was terminated.[3] He heard through the grapevine that it was because Naylor had a relationship with Plaintiff. But he did not know that Plaintiff had reported Naylor. No one told Ferguson that Plaintiff made the complaint about Naylor.

---

[2] For example, the last nine facts Plaintiff submitted all relate to other officers who were terminated or resigned for offenses unrelated to Plaintiff's case. The evidence submitted in support of these facts does not bear on whether <u>Plaintiff's</u> treatment was retaliatory for her own protected activity. The same goes for Plaintiff's evidence of other employees' claims of retaliation. Plaintiff attempts show that other employees (including Otero) have also made claims of retaliation against Defendant. But she fails to establish that the allegations of other employees are related or relevant in any way to her own claims. Notably, Judge Crabtree granted summary judgment against Otero and the Tenth Circuit affirmed. *Morgan v. City of Overland Park, Kan.*, 2023 WL 3195091 (10th Cir. 2023).

[3] Plaintiff's proposed fact states, "In September or October of 2022, Sergeant Pesek informed Ferguson of [Plaintiff's] complaint against Naylor." She cites Ferguson's deposition testimony in support. But Ferguson did <u>not</u> testify that he learned of Plaintiff's complaint at that time. He testified, "I was told through the grapevine that [Naylor] had a relationship with [Plaintiff], and a supervisor can't have a relationship with a subordinate. . . . I don't know for sure if it was [Pesek] or somebody else that mentioned they had a relationship and [Naylor] was terminated." Doc. 74-7 at 10. Later, Ferguson testified that no one ever told him that Plaintiff accused Naylor of sexual harassment. Doc. 62-23 at 14. The Court acknowledges that the September-October timeframe could not be the time that Ferguson learned Naylor was terminated; Naylor was not terminated until November. Nevertheless, this is the date range reflected in the testimony.

- **November 9 (Naylor's Termination and Otero's Knowledge of It):** Donchez notified Naylor of his termination for sexual harassment. Otero received an email that same day stating that Naylor had been terminated. She therefore knew that Naylor's employment had ended. But there is no evidence that Otero knew why or that Plaintiff had reported Naylor's conduct.

- **Between September and November 22 (Plaintiff's First Tardy):** Plaintiff reported late to roll call, but it is not noted in her file and she received no discipline.

- **November 22 (Plaintiff's Second Tardy):** Plaintiff arrived to roll call seven minutes late. Ferguson issued Plaintiff a "coach/counsel" for tardiness. A "coach/counsel" is not discipline. But it is part of the progressive discipline process.[4] Plaintiff was unaware that Ferguson issued the "coach/counsel" until her performance review in December.

- **November 22 (Report by Assistant District Attorney About Plaintiff):** An assistant district attorney told Ferguson that Plaintiff (1) had not recorded an interview she conducted with a rape victim, as required by policy, and (2) was late for a court appearance. Plaintiff admitted both incidents. Ferguson informed Plaintiff that department policy required her to explain in her report why there was no recording of the interview. He gave her a coach/counsel for being late to court.

- **November 29 (Plaintiff's Third Tardy):** Plaintiff was one hour late to work. Ferguson issued her a documented verbal reprimand for tardiness. But again, Plaintiff was unaware she received the verbal reprimand until her performance review in December.

- **November-December (Closer Scrutiny of Plaintiff):** Ferguson began subjecting Plaintiff to closer scrutiny. At one point, when Plaintiff was with Roush on patrol, Ferguson called her several times in short succession, and Roush commented on Ferguson calling her so frequently. Roush indicated Ferguson contacted him about once per shift. Ferguson began calling Plaintiff into his office for meetings almost every week.

- **December (Plaintiff's Performance Evaluation):** Ferguson gave Plaintiff her performance evaluation. The evaluation scale, from highest rating to lowest rating, is (1) key contributor, (2) contributor, (3) performer, and (4) underperformer. "Performer" is a good rating, meaning the employee's performance is "acceptable." Ferguson gave Plaintiff the same ratings she received in 2021 except one. In the "professionalism" category, Ferguson rated Plaintiff "performer" instead of "contributor" because of her repeated tardies.

---

[4]    Discipline should be progressive pursuant to department policy. But it is only progressive with respect to similar violations. A violation of one type of policy does not add to a violation of a different type of policy. Supervisors have discretion to give the same level of discipline multiple times without progression. And discipline need not be progressive when the conduct warrants otherwise.

- <u>December 8</u>: Donchez knew by at least this date that Plaintiff alleged she was being retaliated against for reporting Naylor. This is the date on the letter he received from the City Attorney.

- <u>December-January (Plaintiff's Training Requests)</u>: Plaintiff submitted ten different training requests to Otero for online training in December. Many were free. Otero delayed responding before denying all Plaintiff's requests. She ultimately approved one training for Plaintiff, but it was not one that Plaintiff had requested.

- <u>January and/or Maybe Sometime Prior (Plaintiff's Talks with Miller and Ferguson)</u>: Plaintiff verbally asked Miller for "help." She also asked Ferguson "why treatment was being—was changing too . . . And he kept telling me that it's—it's not." Doc. 74-2 at 14.

- <u>January 10 (Citizen's Complaint Against Plaintiff)</u>: A citizen filed a formal complaint against Plaintiff. The complaint alleged Plaintiff was rude and disrespectful during two visits to the citizen's home on January 9 and 10. Happer told Ferguson to investigate. Ferguson concluded Plaintiff had not been rude on January 9 but that she had violated the City's professionalism policy on January 10. Ferguson gave Plaintiff a "coach/counseling" for this first offense. Miller responded to Ferguson's recommendation on February 14: "OK, but I want her professionalism addressed. Not so much the exact interactions here, but the totality of how she conducts herself. Being late, being rude, and whatever else she does/did in that context that you're aware of, I want it addressed. She needs to increase her maturity and professionalism and understand this is a professional organization with high expectations and standards." Doc. 74-22 at 1.

- <u>January 19 (Plaintiff's Fourth Tardy)</u>: Otero reported Plaintiff being late to roll call, which was at 6:00 a.m. Plaintiff disagrees that she was tardy on this occasion.[5] But Otero reviewed surveillance video from the parking lot and confirmed that Plaintiff swiped her badge to open the station's exterior door after 6:00 a.m. Roll call had not yet started when Plaintiff arrived. Otero told Ferguson to address Plaintiff's late arrival.

- <u>After January 19 Tardy (Plaintiff's Complaints about Otero)</u>: Plaintiff states in her declaration that she told Ferguson she believed "Otero was retaliating against [her] because of [her] complaint, i.e. the sexual harassment complaint [she] filed against Sgt. Naylor." Doc. 74-11 at 1. Ferguson describes the conversation differently. He testified in deposition that he asked her if there was a reason she was unable to get to roll call on time. "She made a comment that she doesn't like—she dreads seeing Captain Otero when she comes to work because she feels like she is mean, not nice, whatever, I can't remember the exact verbiage." Doc. 74-7 at 28. He reported the conversation to Otero, who then asked him to

---

[5]    Plaintiff also refers to this incident as when she was "15 seconds late," implicitly acknowledging that she was technically late. But she disagrees with whether such a miniscule amount of time should be counted against her.

set a meeting with Plaintiff. Otero testified that Ferguson told her Plaintiff thought she was "rude." Doc. 74-6 at 15. Otero and Plaintiff met in Otero's office. Ferguson sat in. During this meeting, Plaintiff told Otero she felt she was being treated differently because Otero wasn't approving her training requests. At some point after January 19, Otero told Miller that Plaintiff felt she was being picked on. It is unclear whether this was the same conversation that Otero and Miller had on January 30 or 31, or whether Otero and Miller had two different conversations about it.

- <u>January 25 (Plaintiff's Fifth Tardy)</u>: Plaintiff arrived three minutes late to an in-service training meeting. Otero learned of the tardy and told Ferguson to address it. Ferguson talked with Plaintiff but did not escalate progressive discipline because she had not yet received the written reprimand for the January 19 tardy.

- <u>January 29 (Plaintiff's Written Reprimand)</u>: Ferguson issued Plaintiff a written letter of reprimand for Plaintiff's January 19 tardy. Doc. 62-4 at 2. Ferguson recommended the discipline and Otero approved. Miller also approved, Happer discussed the matter with Miller, and Donchez signed off on the letter and discipline. Ferguson cc'ed Happer, Miller, Otero, and Plaintiff's personnel file.

- <u>January 30 (Plaintiff's Complaints to Miller about Otero)</u>: Plaintiff stopped by Miller's office and complained to Miller that she believed Otero was "coming after" her or "pick[ing] on" her. Plaintiff claims she also said, "I believe it's retaliation for making my report," but she "didn't expand" on that comment. Doc. 62-22 at 48. Miller denies Plaintiff alleged "retaliation," Doc. 62-24 at 18, 55, and a third-party investigator independently reported to Defendant that she agreed with Miller's account. Miller indicated that if Plaintiff had used the word "retaliation" rather than "picked on," he would have escalated the matter pursuant to the department's policy against retaliation. Miller advised Plaintiff she should take responsibility for arriving on time and explained that the issue was not that she was only a few seconds late, but that she was, in fact, late, stating, "listen to what you are saying, you are late and you are upset that they are documenting and correcting your behavior for being late." Miller told Otero what Plaintiff said. But Otero took no retaliatory actions against her after this January 30 conversation with Miller. Miller did not report what Plaintiff said to anyone else, did not investigate what Plaintiff said, and did not escalate the matter for further review.

- <u>January 31 (Meeting to Deliver Written Reprimand)</u>: Ferguson and Otero met with Plaintiff to deliver the written reprimand for Plaintiff's January 19 tardy. Otero told Plaintiff that she doesn't have time to pick on her or anyone else because she's in charge of twenty-seven officers. Otero also suggested that Plaintiff could appear more professional by including a subject on her emails, which Plaintiff found condescending. And Otero told Plaintiff that she could go to HR if she was uncomfortable speaking with her, Miller, or Ferguson.

- <u>February 11 (Safety Concern with Plaintiff's Treatment of Arrestee)</u>: Plaintiff told a suspect she was going to arrest him for domestic violence. But she allowed him to return unaccompanied into his home and to collect items from his vehicle before she restrained him. The backup officer on the scene reported what he perceived to be a safety issue to his sergeant, who recommended that Ferguson review Plaintiff's bodycam footage. Ferguson did. Ferguson instructed Plaintiff to handcuff arrested subjects immediately and explained that she needed to control the situation. Ferguson documented this "as a training by meeting" with Otero's approval.

- <u>March 10 (Plaintiff's Missed Shift/Sixth Attendance Violation)</u>: Plaintiff did not work an overnight security shift she had volunteered to work. She notified her event supervisor at 3:00 p.m. that she would be unable to work the shift, and she notified another officer at the event at 7:00 p.m. that she would not be there. But Plaintiff violated policy because she had not been excused from working the shift.

- <u>April 3-6 (Plaintiff's One-Day Suspension)</u>: Ferguson, after consultation with Otero, recommended suspending Plaintiff for one day for missing the shift. Ferguson's April 3 disciplinary letter was copied to Otero, Miller, and Happer. Miller signed it, and Happer and Miller discussed it. Donchez held a due process hearing on April 6 and approved Ferguson's recommendation. Plaintiff accepted and served her suspension without appeal.

- <u>April 8 (Domestic Battery and Possible Kidnapping)</u>: A witness reported a domestic battery and possible kidnapping. She described the suspect's vehicle and its tags. Plaintiff was dispatched to respond. She spotted the vehicle at the intersection of Antioch Road and West 103rd Street in Overland Park. Plaintiff was the first vehicle at the stoplight of the intersection, pointed north on Antioch Road, in the turn lane to turn west on 103rd. The suspect vehicle was the first vehicle in its lane at the stoplight, facing west on 103rd, in the turn lane to head south on Antioch Road (crossing directly in front of Plaintiff's vehicle). The vehicles were nose-to-nose.

  Plaintiff told dispatch that she was "not in a position to make contact" with the suspect. Chappell, who was watching the traffic camera footage live from the police station, responded, "What was that traffic?" because, from what he observed, Plaintiff made "absolutely no attempt to stop the vehicle as it passed directly in front of and then beside her, and then lie[d] to Dispatch about it." But Plaintiff again repeated that she was "not in a position to make contact," adding that the "couple looked like they were just sitting in their seats, and I don't see a disturbance" based on her observation of the vehicle's occupants as the vehicle crossed through the intersection right in front of her. McNeely directed Plaintiff to "stop the vehicle and investigate." The traffic light video and dispatch audio are not synched, so the exact timing of events is unclear and disputed.

Roush was also in the area and pursued the vehicle with lights and sirens. Plaintiff began driving when her light turned green, turned around, and followed Roush, eventually activating her lights and sirens. They lost the vehicle.

Chappell emailed Miller and copied Otero, outlining in detail his impressions of the incident and stating: "Based on my direct observations and investigation, I believe [Plaintiff] was willfully derelict in her duties as an Overland Park Police Officer. Instead of taking even the least amount of action to intercede on behalf of a victim and attempt to investigate a serious crime with mandatory arrest protocols, she made excuses and did not follow direct orders when it was obvious a legal intervention was needed. Her inaction also placed her fellow officer and other members of the public at greater risk as well. As such, I am requesting formal discipline of this officer and am prepared to move forward if you are in agreement upon review." Doc. 64-7 at 3. Chappell also contacted Ferguson and told him he wanted Plaintiff to "type up an explanation . . . about why she did not stop the car and . . . to do it as soon as possible." Doc. 62-23 at 42. Ferguson contacted Plaintiff and told her she was required to make a written statement before she went home for the day. Plaintiff did so.

- After April 8 (Plaintiff's Participation in Explorer Program): Otero decided Plaintiff should no longer be given any ride-along assignments with the department's Explorer Program. Plaintiff otherwise still could attend program meetings. Plaintiff was the only officer Otero ever "removed" from the program. Plaintiff admits the City could decide which employees participate in this program and legitimately could exclude employees who had been disciplined. Doc. 62-22 at 120. But she claims Otero's decision was retaliatory solely because she "didn't feel like they could give me a direct answer on why they were taking me off of it . . . ." *Id.* at 119.

- April 11-14 (Ferguson's Investigation of April 8 Incident): Miller told Ferguson to investigate and complete a report about the April 8 incident. Miller also told Ferguson to complete a discipline recommendation memo if he found that Plaintiff violated City policy. Miller directed Ferguson to "do a deep dive into her mindset," which meant Ferguson should "[t]ry to find out from her perspective what decisions she made [and] why she made them," "as opposed to just watching the video [and] taking everyone's statements." Docs. 62-23 at 4, 62-24 at 35.

Ferguson reviewed Chappell's allegations and thought they "looked serious" because, having watched the events unfold live on the traffic camera, Chappell "felt like [Plaintiff] was neglecting her duty to stop the suspect car, because all she had to do was turn on lights and sirens, make a U turn and stop them." Doc. 62-23 at 41. Ferguson reviewed audio and video recordings from the incident and interviewed witnesses, including McNeely, Chappell, Roush, and Plaintiff, as documented in his April 14 eleven-page investigation report. Ferguson concluded that Plaintiff violated seven City policies by: (1) speeding without her emergency equipment activated; (2) not stopping the suspect when she had the

chance and even after receiving a direct order; (3) misrepresenting that she was not in a position to make the stop; (4) misrepresenting that she intended to stop the vehicle even though she made no attempt to do so; and (5) insisting "she would do the same thing" next time. Ferguson recommended that Plaintiff receive discipline, but he did not recommend a specific discipline. He was not involved in the decision to terminate Plaintiff's employment.

Ferguson's report went up the chain of command. When Otero received it, she reviewed it and the recordings and concluded Plaintiff's employment should be terminated "[b]ecause she failed to do her duty to ensure the safety of a potentially kidnapped domestic violence victim" when the suspect's "car went by her and she remained at the stop." Doc. 62-26 at 48. However, Otero was not involved in the incident, its investigation (other than passing the report up the chain of command), or the decisions to suspend Plaintiff pending investigation and then to terminate her employment.

- <u>April 21 (Plaintiff's Report of Retaliation to HR)</u>: Plaintiff reported to HR that she thought Otero was retaliating against her because of her complaint against Naylor. HR told the City Attorney, who engaged an independent third party (Michelle Minor) to investigate Plaintiff's allegations on May 2.

- <u>Between April 14 and May 3 (Miller's Recommendation of Termination)</u>: Miller recommended to Donchez that Plaintiff's employment be terminated. Miller based his recommendation solely on the April 8 incident, which he believed warranted termination because officers' "primary responsibility . . . is to protect the public and [officers] have to do that duty in the face of danger and sacrifice . . . . In this particular case she did not, when she had the opportunity to do so." Doc. 62-24 at 40. "[T]he facts say that she should have taken action," but she "allowed that domestic violence suspect and victim of a possible kidnapping [to] drive right by her and not stop them and not intervene in any way to save that victim." *Id.* at 40-41.

- <u>May 3 (Meeting with Plaintiff about Recommended Termination)</u>: Miller and Happer (in place of Donchez, who was unavailable) met with Plaintiff on May 3 to notify her that Miller recommended her termination and that she was being placed on paid administrative leave until a final decision was made.

- <u>May 5 (Miller's Letter Recommending Termination and Donchez's Decision)</u>: Miller memorialized his recommendation in a letter to Plaintiff dated May 5, stating his recommendation to terminate Plaintiff for violations of City policy and a "serious lack of appropriate judgment" and "unacceptable" behavior on April 8, pending a due process meeting with Donchez.

Donchez agreed Plaintiff should be terminated based on Ferguson's report and the traffic camera video. He believed "she was derelict in her duties" and not truthful in her statements. The video showed "numerous occasions where there are no other vehicles in

the intersection, so she certainly could have pulled across and blocked that vehicle from . . . proceeding," or, after it left, "[s]he could have hung a U-turn and went right after the vehicle rather than waiting for what seemed to me forever at the light until it changed and then made a left and then made her way turning around," yet "she's telling her superiors . . . that she's not in a position to stop the vehicle," even though "anybody watching . . . can see that she absolutely did have the ability to stop the vehicle." Doc. 62-25 at 15-16, 25-28. The prior attendance issues were not a factor in Donchez's decision. *Id.* at 16. Donchez made the decision to terminate Plaintiff, but the City did not terminate her yet because it first wanted to make sure that Plaintiff's April 21 retaliation allegations were not substantiated. The April 8 incident was the sole basis for Donchez's termination decision.

- <u>May 21 (Plaintiff's Retaliation Charge)</u>: Plaintiff dual-filed a charge of retaliation with the KHRC and EEOC. There is no evidence that anyone in Plaintiff's chain of command knew about this charge before her resignation

- <u>June 12 (Report Completed on Plaintiff's Complaint of Retaliation)</u>: Michelle Minor completed her investigation and report on Plaintiff's allegations that Otero retaliated against her. In the process, she had interviewed Plaintiff (May 5) Miller (May 10), Ferguson (May 11), Otero (May 19), and McNeeley (May 22), among others. Minor failed to substantiate Plaintiff's allegations.

- <u>June 15 (Plaintiff's Resignation)</u>: Donchez met with Plaintiff and told her that he was affirming Miller's recommendation of termination. Plaintiff asked whether she could resign in lieu of termination. Donchez accepted her resignation.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts applying this standard view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

### III.    ANALYSIS

Plaintiff claims Defendant retaliated against her for engaging in protected activity. Where a plaintiff only has indirect or circumstantial evidence of discrimination (as is the case here), the *McDonnell Douglas*[6] burden-shifting framework applies. *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015). Under this framework, a plaintiff must first establish a prima facie case of retaliation under Title VII. This requires a plaintiff to show: (1) she engaged in protected activity; (2) she suffered an adverse employment action during or after her protected activity, which a reasonable employee would have found materially adverse; and (3) there was a causal connection between the protected activity and the adverse action. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013).

The plaintiff's burden at the prima facie stage of the analysis is not onerous; only a minimal showing is necessary. *Id.* at 1216. If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for its adverse employment actions. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017). If the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reasons for its actions are mere pretext for discrimination. *Id.*

Plaintiff has taken the approach of identifying multiple times she believes she engaged in protected activity and multiple ways Defendant took adverse action against her. But this approach also results in a case spread too thin. At its core, this case really has only one claim with potential to reach trial: Plaintiff's claim that Defendant retaliated against her for her April complaint of retaliation when it decided to terminate her employment for how she handled the domestic battery and suspected kidnapping dispatch. The Court undertakes the full *McDonnell Douglas* analysis for

---

[6]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

all Plaintiff's allegations in the interest of thoroughness. Defendant did the same. But the Court readily finds that no reasonable jury could conclude that Defendant decided to terminate Plaintiff's employment or took other adverse action because Plaintiff engaged in protected activity.

### A.    Prima Facie Case

As noted above, there are three elements of Plaintiff's prima facie retaliation case. Plaintiff engaged in some activities that are protected (Naylor sexual-harassment report on September 6,[7] report to HR on April 21, and EEOC charge on May 21), and she suffered two materially adverse employment actions (her one-day suspension and termination). Plaintiff also makes a prima facie showing of causation between her April 21 report and Defendant's termination decision. But she fails to demonstrate that her other complaints constitute protected activities, she fails to show that Defendant's other acts were materially adverse, and she fails to connect any of the other events to an adverse action to meet her burden of showing causation. Simply put, she does not establish a prima facie case of retaliation for any claim but her termination/resignation.

### 1.    Protected Activities

Plaintiff alleges that she engaged in at least six protected activities. Defendant concedes there are three. The three conceded activities are: Plaintiff's September 6 report of Naylor for sexual harassment, Plaintiff's April 21 report of Otero's retaliation, and Plaintiff's May 21 EEOC charge. The Court accepts that these three actions are protected activities and looks more closely only at the three disputed actions: (1) Plaintiff told Miller on January 30 that Otero was "picking on" her; (2) Plaintiff reported Otero's retaliation to Ferguson around January 19; and (3) Plaintiff

---

[7]    Plaintiff does not discuss her additional September 30 report of retaliation that was investigated by the City Attorney.

reported retaliation to Ferguson and Miller earlier in 2023. None of these actions constitute protected activity.[8]

Employee complaints should communicate that they implicate unlawful discriminatory conduct to qualify as protected opposition. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). The employer must know that the employee has engaged in protected opposition. *Id*. No "magic words" are required. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). But a "vague reference . . . will not support a retaliation claim." *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004). "Protected opposition occurs when an employee conveys to his employer that the employer has done something unlawful under the federal anti-discrimination laws." *Boliere v. Robert Brodgen's Olathe BuickGMC Inc.*, 706 F. Supp. 3d 1275, 1295 (D. Kan. 2023).

<u>First</u>, Plaintiff's January 30 complaint to Miller about Otero does not constitute protected opposition. Plaintiff told Miller that "Otero was coming after me or I felt she was and I didn't feel welcome . . . ." Doc. 74-2 at 15. Plaintiff claims she also said, "I believe it's retaliation for making my report," but she "didn't expand" on that comment. Doc. 62-22 at 48. Miller denies Plaintiff said the word "retaliation." Doc. 62-24 at 18, 55. But even taking Plaintiff's allegation as true, she admits she did not "expand on" what she meant. Plaintiff gave no further details that would have indicated <u>what</u> report she was referring to. By the end of January, Plaintiff's report about Naylor was nearly five months old.[9] Miller knew of the sexual-harassment report shortly after it was made. But there is no evidence Otero ever knew that Plaintiff had made a complaint. And there is no

---

[8]    Plaintiff discusses her January 30 complaint to Miller in some detail. Doc. 74 at 36-37. But she barely mentions the other two alleged complaints. She does not support them with further argument or legal citation. *Id.*

[9]    Donchez received the December 8 report on Plaintiff's retaliation claim in a closer temporal proximity. But there is no evidence that Miller knew of the report. And Plaintiff does not identify her September 30 complaint of retaliation as a protected activity.

evidence suggesting Miller should have known or did know that Plaintiff was complaining of unlawful retaliation, particularly with such an extended time delay. Plaintiff's statement is too vague to convey that she believed Otero was violating federal anti-discrimination law. And the context of when and how Plaintiff talked with Miller is unclear, but Miller remembers Plaintiff stopping by his office, which was not unusual, as officers stopped by his office "all the time." He did not take any notes, and the conversation was short. The Court is mindful that no "magic words" are necessary. But Plaintiff is aware how to make a formal complaint. By January, she had already made two (the original Naylor complaint and the supplement for retaliation). She made another in April and then filed a charge with the EEOC in May. No reasonable jury could conclude that Plaintiff engaged in protected activity on January 30.

Second, Plaintiff's report to Ferguson about Otero suffers from the same flaw. Ferguson and Otero's recollection of this conversation is that Plaintiff said Otero was "mean," "not nice," or "rude." Plaintiff states that she told Ferguson that Otero was retaliating because of her "complaint." She then clarified in her declaration "i.e. the sexual harassment complaint [she] filed against Sgt. Naylor." Doc. 74-11 at 1. Again, assuming Plaintiff's version as true, she does not say that she specified to Ferguson that the relevant "complaint" was her sexual harassment complaint against Naylor. And Ferguson maintains that no one ever told him that Plaintiff made a sexual harassment complaint against Naylor. A generic comment about a complaint is insufficient to constitute protected activity.

Third, Plaintiff's alleged complaints to Ferguson and Miller prior to or in January fare no better. It is not even clear that these complaints were made in separate conversations than the conversations around January 19 and on January 30. In any event, the evidence is that Plaintiff verbally asked Miller for "help." She also asked Ferguson "why treatment was being—was

changing too . . . And he kept telling me that it's—it's not." Doc. 74-2 at 14. Neither of these comments are specific enough to put the listener on notice that Plaintiff was complaining of retaliation in violation of federal discrimination laws.

The only protected activities at issue are Plaintiff's September 6 report of Naylor for sexual harassment, Plaintiff's April 21 report of Otero's retaliation, and Plaintiff's May 21 EEOC charge. The Court will review Defendant's actions as they relate (or do not relate) to these activities.[10]

### 2.    Materially Adverse Employment Action

Plaintiff alleges six materially adverse employment actions. Defendant concedes two (Plaintiff's one-day suspension for missing her shift and Plaintiff's termination). This leaves four actions in dispute: (1) the increased scrutiny of Plaintiff; (2) Otero's denial of Plaintiff's training requests; (3) Plaintiff's "removal" from the Explorer Program; and (4) the discipline Plaintiff received for attendance violations. Plaintiff also argues that the Court should look at Defendant's actions in the aggregate.

A materially adverse action is one that might have dissuaded a reasonable employee from engaging in the protected activity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). What is considered materially adverse depends on the context and circumstances of the case. *Id.* at 69. But mere increased supervision or application of policy does not qualify as an adverse employment action. *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 914 (10th Cir. 2012) (finding no materially adverse employment action where the plaintiff complained of "strict application of policies, increased supervision, write-ups, means and methods of communication with her supervisors, and restrictions on her employment relationships"); *see also*

---

[10]    Even if these other actions constitute reports, they suffer from the same flaws with respect to adverse employment actions, causation, and pretext.

*Lewis v. Wilkie*, 909 F.3d 858, 869 (7th Cir. 2018) (knowledge that co-workers were instructed to monitor the plaintiff would not dissuade a reasonable employee from engaging in protected activity).

The Court turns to the four disputed actions with these standards in mind.

### a.    Increased Scrutiny

Plaintiff first alleges that Ferguson subjected her to heightened scrutiny after she complained about Naylor. He called her while she was on duty and met with her often. These actions simply do not rise to the level of a materially adverse employment action. *See Kincaid v. Unified Sch. Dist. No. 500*, 645 F. Supp. 3d 1134, 1165-66 (D. Kan. 2022); *see also Winston v. Ross*, 725 F. App'x 659, 666 (10th Cir. 2018) (addressing "additional scrutiny"). There is no evidence that the increased scrutiny resulted in any kind of tangible negative impact on Plaintiff. And Plaintiff has made no showing that being subjected to more calls or meetings would deter a reasonable employee from making a charge of discrimination. The increased scrutiny did not constitute a materially adverse employment action, and no reasonable jury could find otherwise.

### b.    Denial of Training

Plaintiff also fails to show that the denial of training was materially adverse. She has not shown that the training would have significantly contributed to her professional development. And she was not denied all training; Otero did approve one full-day training in 2023 for Plaintiff (sexual assault investigations training), although it was not one Plaintiff requested. Miller and Otero knew Plaintiff was interested in this training. They also switched her schedule so she could use the training to save herself a day of paid leave. Moreover, Plaintiff completed seventeen trainings from September 22, 2022, through her resignation. *See Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007), *abrogated on other grounds by Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110

(8th Cir. 2024) (finding no materially adverse employment action where the plaintiff was "denied permission to attend one training session, but in fact had permission to and did attend several others"); *Henrie v. Carbon Sch. Dist.*, 2023 WL 1948621, at *3 (10th Cir. 2023) (finding no materially adverse employment action for a denial of "training for a position [plaintiff] might take over at some undetermined point in the future," contrasting it to a training that would "'contribute[] significantly to the employee's professional advancement'" (quoting *Burlington N.*, 548 U.S. at 69)).

### c.      Removal from Explorer Program

The uncontroverted evidence shows that Plaintiff was not actually "removed" from the Explorer Program. She remained able to attend meetings. She was just not able to participate in ride-alongs. She has not presented any evidence that she actually lost overtime or otherwise suffered a materially adverse impact because she missed one or more ride-alongs. It is unclear how long Plaintiff was impacted by Otero's decision or whether any ride-alongs were scheduled during that time or whether she actually lost any overtime pay. She has not shown that this act would deter a reasonable employee from making a claim of discrimination. *See Kenfield v. Colo. Dep't of Pub. Health & Env't*, 557 F. App'x 728, 733-34 (10th Cir. 2014) (finding that stripping a plaintiff of some job duties was not materially adverse because it did not in fact deter her from pursuing a remedy).

### d.      Discipline for Tardiness

Plaintiff contends that Ferguson took materially adverse action against her when he began citing her for tardiness shortly after she reported Naylor for sexual harassment. She claims that the series of incidents shows a pattern of retaliation and constitutes materially adverse action because they are part of a progressive discipline regimen that may lead to harsher discipline. She argues

that her eventual one-day suspension was the result of the previous minor citations for tardiness and that it would not have occurred but for those earlier citations.[11]

"Disciplinary proceedings, such as warning letters and reprimands, can constitute an adverse employment action." *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1137 (10th Cir. 2005). But expecting an employee to be punctual and abide by attendance rules does not deter a reasonable employee from reporting discrimination. *Kincaid*, 645 F. Supp. 3d at 1165. And neither does using a progressive discipline process for conduct that admittedly occurred. *See Winston*, 725 F. App'x at 666 (finding not materially adverse a "letter of caution [that] was premised on mistakes she admitted to having made"); *Steele v. Kroenke Sports Enters., L.L.C.*, 264 F. App'x 735, 746 (10th Cir. 2008) (verbal warnings for not following leave policy not materially adverse); *Duvall v. Putnam City Sch. Dist.*, 530 F. App'x 804, 810-11 (10th Cir. 2013) (same, letter of admonishment).

### e.   Aggregation of Actions

Finally, Plaintiff argues that the Court should not view Defendant's actions in isolation. She asks the Court to consider them as part of an overall retaliation pattern. She cites *Adcox v. Brennan*, 2017 WL 2405326, at *8 (D. Kan. 2017), in support, plus cases from the Second, Eighth, and Eleventh Circuits. *Adcox* concluded that a manager's conduct in the aggregate could dissuade a reasonable employee from reporting discrimination. But it was in the context of a retaliatory harassment claim. And Judge Crabtree noted in *Kincaid* that adding zeros "just produces another zero." 645 F. Supp. 3d at 1166; *see also Somoza v. Univ. of Denver*, 513 F.3d 1206, 1219 (10th Cir. 2008) ("It cannot be said that negative comments, condescending looks, perceived exclusion

---

[11]   Plaintiff also notes as part of her "materially adverse action" discussion how other officers under Ferguson were "constantly late," and how no one informed her that she could use vacation/flex time for tardies to avoid discipline. These arguments seem more appropriate for a pretext analysis.

from hiring and firing decisions, and a reduction in the administrative authority within the department aggregate to produce material and adverse actions against these Appellants."). Here, even if the Court were to consider the sum of Plaintiff's four asserted materially adverse actions, they do not equate to an amount that could dissuade a reasonable employee from reporting discrimination.[12]

### 3.    Causation

Defendant concedes that Plaintiff can meet her prima facie burden of showing causation for Donchez's June 15 termination decision because of its temporal proximity to Plaintiff's April 21 complaint and the reasonable inference that Donchez knew of the complaint's investigation. But Plaintiff cannot establish causation for the other <u>actual</u> materially adverse employment action, her one-day suspension. And even if the Court were to consider the other four identified actions above, she cannot establish causation for them, either.

To causally connect Plaintiff's complaint of retaliation with any materially adverse employment action, Plaintiff must present "evidence of but-for causation . . . based on more than mere speculation, conjecture, or surmise." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018) (quotation omitted). A court may presume causation if an adverse employment action is very closely tied in time. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011). But if intervening events occurred between the protected activity and the adverse action, evidence of temporal proximity has minimal probative value. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-02 (10th Cir. 2011).

---

[12]    The Court also notes that, at least according to Plaintiff, she continued complaining of retaliation in January and later in 2023. This suggests that any actions taken by Defendant would not objectively dissuade a reasonable employee from reporting discrimination. *See Somoza*, 513 F.3d at 1214 ("[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the actions are sufficiently material and adverse to be actionable.").

Plaintiff's first overriding problem with causation is lack of awareness of her protected activity. Nearly all the retaliatory actions Plaintiff alleges occurred after her report about Naylor (September 6) but before her report about Otero (April 21).[13] And for most of the allegedly materially adverse actions Plaintiff alleges, the decisionmakers (Ferguson and Otero) were unaware she complained about Naylor. Both Ferguson and Otero were aware that Defendant terminated Naylor's employment. And they both heard rumors that Plaintiff and Naylor had been in a sexual relationship. But they both also testified that no one ever told them that Plaintiff had reported the sexual harassment. Plaintiff offers nothing but speculation and inaccurate representations of the record to support her position that they knew of her protected activity. She fails to create a genuine issue of material fact as to whether Ferguson and Otero were aware she made a sexual-harassment complaint. Absent awareness, there can be no causation.[14]

The second overriding problem with causation is lack of temporal proximity. Donchez, Happer, and Miller knew that Plaintiff complained that Naylor sexually harassed her shortly after her complaint. But they did not take action (the one-day suspension) against Plaintiff until seven months later.[15] This delay is far too long to support an inference of retaliation by temporal proximity.

Plaintiff has not established causation, so her retaliation claim based on anything but her termination/resignation fails for this alternative reason.

---

[13]    No reasonable jury could find that Plaintiff's alleged reports in January constituted protected activity.

[14]    Plaintiff argues that a pattern of retaliatory conduct can help establish causation. Doc. 74 at 43-44. But she primarily faults Ferguson and Otero for the pattern of retaliatory conduct. *See id.* Regardless of whether a pattern of conduct can overcome temporal-proximity issues, Plaintiff still fails to establish that Ferguson and Otero knew of her complaint about Naylor. She only has established that they knew of Naylor's termination and heard rumors about Plaintiff and Naylor's relationship. This is a critical distinction on which most of Plaintiff's arguments fail.

[15]    Even if the Court were to accept that Plaintiff's January reports constituted protected activity, only Miller was aware. Donchez made the ultimate decision to suspend Plaintiff on April 6.

## B.    Legitimate, Non-Retaliatory Business Reason

The Court need not proceed with the remainder of the *McDonnell Douglas* analysis for most of the alleged retaliatory acts because Plaintiff has not established her prima facie case. But even assuming Plaintiff had demonstrated a prima facie case, Defendant has offered legitimate, nondiscriminatory reasons for its actions. Defendant's burden at this stage is "exceedingly light," requiring only production—not persuasion. *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011).

Defendant presents the following business reasons for its actions: (1) Defendant decided to terminate Plaintiff's employment due to her "serious lack of appropriate judgment" and "unacceptable" behavior on April 8, when she allowed a domestic violence and kidnapping suspect to escape and misrepresented what happened; (2) Defendant suspended Plaintiff for one day as progressive discipline for her attendance violations; (3) Ferguson closely monitored Plaintiff because of performance issues; (4) Otero denied Plaintiff's requests for trainings because they were expensive, on inappropriate topics for Plaintiff's experience, or would create staffing issues; (5) Otero did not remove Plaintiff from the Explorer Program, but instead prohibited her from doing ride-alongs because of the ongoing investigation for dereliction of duty; and (6) the additional discipline for tardies was consistent with Defendant's progressive discipline process, even if Plaintiff disagreed that one of them should have been counted as a tardy.

Defendant has sufficiently shown it had legitimate, non-retaliatory business reasons for its actions.

## C.    Pretext

Because Defendant offers legitimate, non-discriminatory reasons for its actions, the burden reverts to Plaintiff to show the proffered explanations are "more likely" pretexts for discrimination.

*Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). Plaintiff has not carried that burden. Typical avenues for demonstrating pretext include providing evidence that (1) the stated reason is false, (2) the defendant acted contrary to its written policies, and (3) the plaintiff was treated differently than similarly situated employees. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). In analyzing a plaintiff's claim of pretext, courts examine the facts as they appear to the individual making the employment decision; the court's role is not to "second guess" the employer's business judgment. *Id.*; *see also Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[O]ur role is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."). Nor is the court's role to ask whether the decision was wise, fair, or correct. *Dewitt*, 845 F.3d at 1307. Rather, the court must determine whether the employer honestly believed the legitimate, non-discriminatory reason it gave for its conduct and acted in good faith on that belief. *Id*. Mere conjecture that the employer's explanation is pretext is not enough to justify denial of summary judgment. *Id*.

Temporal proximity is one factor that can lead to a finding of pretext, but it is not enough standing alone. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1236 n.10 (10th Cir. 2015). Unless the proximity is very close, it must be combined with other evidence to suggest that the stated reason for the adverse employment action is unworthy of belief. *Id.*; *see also Hysten v. Burlington N. Santa Fe Ry. Co.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002) (noting that a three-month period between the protected conduct and termination is not sufficient to raise an inference of retaliation).

A plaintiff may also show pretext by demonstrating that she "was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness, provided the similarly situated employee shares the same supervisor, is subject to the

same performance standards, and otherwise faces comparable relevant employment circumstances." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 489 (10th Cir. 2006) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (internal quotations omitted)). "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007). But not every difference in treatment points to discriminatory intent; differences explained by nondiscriminatory motives do not establish pretext. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

Plaintiff attempts to show pretext by (1) temporal proximity, (2) evidence that she was treated differently from other employees, (3) Defendant's use of subjective criteria in Plaintiff's progressive discipline, and (4) evidence that she handled the April 8 incident appropriately for the circumstances. None of her efforts is availing. None of them amounts to more than mere speculation that Defendant's nondiscriminatory reasons for its actions are mere pretext for unlawful retaliation. The Court collectively addresses her arguments for all the claimed adverse actions <u>except</u> for the April 8 incident. Both parties devote most of their pretext discussion to the April 8 incident, so the Court discusses it last.

<u>First</u>, Plaintiff fails to show temporal proximity coupled with other evidence suggesting Defendant's reasons are unworthy of belief. The timing of events is insufficient, standing alone, to demonstrate that the reasons for Defendant's actions were pretext for retaliation. The Court explained in its causation discussion why none of the claimed materially adverse actions (except the termination decision) are temporally connected to her protected activities. She has added nothing to her pretext discussion to change that conclusion.

Second, Plaintiff submits evidence that other officers were treated differently. But she fails to submit evidence that they were similarly situated. She argues that she received the following different treatment: (1) Plaintiff received close scrutiny about her attendance, but other officers under Ferguson were "constantly late" and received less harsh discipline; (2) the department allowed officers to use vacation/flex time for tardies to avoid discipline but did not tell her it was an option; (3) other officers did not have their training requests denied, especially for free training; (4) Otero has never removed another officer from the Explorer Program; (5) Ferguson constantly checked on Plaintiff while she was on patrol but only contacted Roush about once a shift; (6) Roush was not disciplined for the April 8 incident even though he also failed to immediately activate his emergency equipment and act with urgency; (7) terminations of other employees have involved much more egregious conduct; and (8) other department employees have complained of discrimination.

The comparisons Plaintiff attempts to make are not to similarly situated officers. *See Grant v. Crystal Lake Partners, Inc.*, 460 F. Supp. 3d 1155, 1165 (D. Kan. 2020) (noting that employees must share the same decisionmaker and be disciplined for comparable conduct). She does not identify other officers with a similar pattern of absences. She cites testimony indicating that officers may, with advance approval, use flex time to still work the full shift and get paid for the full shift.[16] But the testimony does not support Plaintiff's contention that using flex time also allows officers to "erase" a tardy and avoid discipline for it.[17] She does not identify other officers

---

[16]  Plaintiff did not request to use flex time at all, in advance or otherwise.

[17]  Along with several portions of deposition testimony, Plaintiff cites the declaration of Mark Wilson, a former sergeant for the police department who retired in 2020. Wilson states, "If an Officer agreed to use paid time off (PTO) or flex time for being late to work, the use of PTO or the Officer making up the time nullified the tardy, i.e. it was as if the tardy did not occur." Doc. 74-13 at 2. But Wilson does not indicate that this allowed the employee to avoid discipline for being late. Both Miller and Ferguson testified that corrective action may still be issued. Docs. 74-5 at 14, 74-7 at 25. Plaintiff's discussion of the option to use flex time to cover a tardy is an example of cherry-picking evidence and using loose language in the name of advocacy.

who requested similar training from Otero, how it was right or wrong for their position, or its timing and impact on shift coverage. She states one other officer remained in the Explorer Program despite discipline. But she does not explain how the situation resulting in his discipline was similar to hers. She claims she was monitored more closely than Roush and that he was not disciplined in the same manner for the April 8 incident. She does not offer evidence that Roush had similar performance issues. And Roush did receive a coach/counseling for improper speeding. But Plaintiff does not show that Roush ever saw the suspect's vehicle, had an opportunity to stop it, or that Defendant believed he was untruthful during the April 8 incident. And the fact that Defendant terminated other employees (or they resigned) for completely unrelated and different conduct does not bear on the legality of Plaintiff's treatment. Neither does the fact that other employees may have alleged retaliation in the past. Plaintiff has not created a triable issue of fact over whether she was treated differently from similarly situated employees.

Third, Plaintiff contends that Defendant used subjective criteria to make decisions resulting in the adverse employment actions taken against Plaintiff. Specifically, Plaintiff highlights Defendant's progressive discipline process. Plaintiff contends that Ferguson had discretion how to handle discipline relating to her tardies and attendance and that his decision to move up one step every time he cited her supports a finding of pretext. Plaintiff cites *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1060-61 (10th Cir. 2020), and *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007), for the principle that the use of subjective criteria supports a finding of pretext. Plaintiff's citations are accurate. But *Riggs* also notes that "the existence of subjective criteria alone is not considered evidence of pretext; rather, the existence of other circumstantial evidence may provoke a stronger inference of discrimination in the context of subjective evaluation standards." 497 F.3d at 1120. And Plaintiff overlooks the fact that several

times, Ferguson did not go to the next step in the disciplinary process. In any event, once again, Ferguson may have begun the discipline process after Plaintiff complained about Naylor. But there is no evidence that Ferguson <u>knew</u> (or even suspected) Plaintiff complained about Naylor. Also, Plaintiff did not have issues with tardiness before September 2022. No reasonable jury could find that the presence of discretion in Ferguson's decisions calls into question whether any particular decision has a legitimate, non-discriminatory basis.

<u>Fourth</u>, Plaintiff's version of the April 8 incident does not equate to pretext. Plaintiff essentially argues that everyone but her was wrong about their assessment of the April 8 incident, a jury could so-find, and such finding would call into question the validity of Defendant's reason for termination.

The Court has watched the traffic light video and listened to the police-radio recording. They speak for themselves. The Court does not recount both parties' versions of the April 8 incident here. Suffice it to say, Plaintiff believes she was justified in how she handled the call. Defendant and its officers who viewed the incident live and reviewed the video and audio believe Plaintiff displayed serious errors in judgment and was untruthful. Plaintiff has presented no evidence that Chappell, the captain who demanded an investigation into how Plaintiff handled the call, had prior knowledge of Plaintiff's complaint about Naylor or anyone else. This lack of connection is significant, particularly given Chappell's strong reaction to Plaintiff's actions.[18] Plaintiff contends that Ferguson wrote a biased report after investigation. But he completed his

---

[18] Some of the language in Chappell's email to Miller and Otero, sent about three hours after the incident, bears repeating: "Based on my direct observations and investigation, I believe [Plaintiff] was willfully derelict in her duties as an Overland Park Police Officer. Instead of taking even the least amount of action to intercede on behalf of a victim and attempt to investigate a serious crime with mandatory arrest protocols, she made excuses and did not follow direct orders when it was obvious a legal intervention was needed. Her inaction also placed her fellow officer and other members of the public at greater risk as well. As such, I am requesting formal discipline of this officer and am prepared to move forward if you are in agreement upon review." Doc. 64-7 at 3.

report before Plaintiff's April 21 complaint, so again there is no retaliatory connection. And in any event, Donchez testified that he reviewed the video and audio and came to his own conclusion that Plaintiff was derelict in her duties and untruthful in her statements. His final decision on June 15 was less than two months after Plaintiff's April 21 complaint. But this temporal proximity is simply the <u>only</u> evidence Plaintiff has to support a finding that Donchez's decision was pretextual. Temporal proximity alone is not enough.[19]

The question here is not whether Defendant was correct in its assessment. The Court does not act as a "super personnel department" or second-guess Defendant's honestly held business judgments. *Young*, 468 F.3d at 1250. And the Court does not ask whether the decision was fair. *Dewitt*, 845 F.3d at 1307. The only question is whether Defendant honestly believed the reason it gave for its decision and acted in good faith on that belief. There is no issue for a jury to resolve as to Defendant's action.

## IV.    CONCLUSION

Plaintiff has presented no evidence suggesting an issue of material fact exists about whether Defendant's actions were retaliatory in nature. And no reasonable jury could find in her favor on this record. The Court grants summary judgment on Plaintiff's retaliation claim.

THE COURT THEREFORE ORDERS that Defendant's motion for summary judgment (Doc. 61) is GRANTED.

THE COURT FURTHER ORDERS that Defendant's motion to exclude expert testimony (Doc. 57) is DENIED AS MOOT.

---

[19] The Court already addressed above why Roush's discipline for the April 8 event and the treatment of other officers who were terminated for more egregious behavior does not weigh in the pretext analysis.

The case is closed.

IT IS SO ORDERED.

Dated: December 8, 2025                    /s/ *Holly L. Teeter*
                                           HOLLY L. TEETER
                                           UNITED STATES DISTRICT JUDGE